UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
——————————————————————x
                                                          :
DR. PETER RENTROP,                                        :
                                                          :
                                 Plaintiff,               :              04 Civ. 0101 (PKC)
                                                          :
                 -against-                                :
                                                          :
THE SPECTRANETICS CORPORATION,                            :              MEMORANDUM
                                                          :              AND ORDER ON
                                                          :              POST-VERDICT MOTIONS
                                 Defendant.               :
                                                          :
——————————————————————x

P. KEVIN CASTEL, U.S.D.J.

          Peter Rentrop, M.D., brought this action against the Spectranetics Corporation

("Spectranetics"), alleging that certain of their products infringe his U.S. Patent No.

6,673,064 (the "'064 Patent"), claiming an invention of a type of catheter used to deliver

laser energy principally for use in cardiovascular surgery.  Spectranetics asserted various

defenses to infringement and counterclaimed to correct inventorship of both the '064 Patent

and another of Dr. Rentrop's patents, U.S. Patent No. 6,440,125 (the "'125 Patent").

Spectranetics also asserted state-law counterclaims, alleging that Dr. Rentrop converted its

property, misappropriated its trade secrets, and breached a confidentiality agreement.

          A jury was empanelled on November 27, 2006.  On December 8, 2006, the

jury returned its verdict that plaintiff had proven that the accused products infringed claim 1

of the '064 Patent, but that the infringement was not willful.[1]  The jury found that claims 2, 3

---

[1]  The parties stipulated that the jury's "decisions on infringement and validity of claim one will also apply
     to claims 8, 15, 16 and 17."  (Trial Tr. 145.)

and 7 were not infringed.[2]   The jury also found that the '064 Patent was valid, and that Spectranetics' employees, Messrs. Kevin Taylor and Kenneth Harlan, were not inventors or joint-inventors of the '064 or '125 patents.  The jury rejected all of Spectranetics' state-law counterclaims.  The jury found that Dr. Rentrop's damages, based on a reasonable royalty, were $500,000.  Neither the verdict form nor the jury instructions authorized an award of attorneys' fees.  Unprompted, the jury wrote on the verdict form that a sum of up to $150,000, above the $500,000 reasonable royalty, should be awarded to plaintiff to cover costs and legal fees.

After the close of the plaintiff's case, Spectranetics moved for judgment as a matter of law ("JMOL") pursuant to Rule 50(a), Fed. R. Civ. P., on the issues of infringement and willful infringement.  The Court denied the motions without prejudice to renewal and both issues were submitted to the jury.  (Trial Tr. 980.)  Presently before this Court is Spectranetics' timely renewal of its motion for JMOL, pursuant to Rule 50(b), Fed. R. Civ. P., on the issue of infringement.  Spectranetics also now moves to amend the verdict on damages to strike the award of legal fees pursuant to Rules 59 and 60, Fed. R. Civ. P., and moves to preclude plaintiff from seeking pre- and post-judgment interest.[3]

For the reasons stated herein, defendant's motion for JMOL on infringement is denied.  The motion to strike the $150,000 award for legal fees is granted.  The issue of plaintiff's entitlement to pre- and post-judgment interest, however, is not properly before the

---

[2]  The parties stipulated that the decisions on infringement and validity of: (a)  claim 2 applied to claims 9 and 18; (b) claim 3 applied to claims 4, 10, 11, 19 and 20; and (c) claim 7 applied to claims 14 and 23.  (Trial Tr. 145.)

[3]  Defendant also moved to preclude plaintiff from seeking a "premature entry of judgment," by which it means an entry of judgment prior to a determination of defendant's equitable defenses and post-trial motions.  Plaintiff's opposition brief on the motion to preclude pre- and post-judgment interest clarifies that Dr. Rentrop will not seek entry of judgment until the motions and defenses are decided.  With today's entry of Findings of Fact and Conclusions of Law on the equitable defenses, defendant's motion to preclude "premature entry of judgment" is moot.

Court.  Plaintiff has not yet moved for such relief and has indicated an intention to do so within fourteen days of entry of judgment relying upon Rule 54(d)(2)(B), Fed. R. Civ. P.   I am denying defendant's motion insofar as it relates to pre- and post-judgment interest without prejudice to its right to oppose plaintiff's proposed motion.

Background

Dr. Rentrop is a cardiovascular interventionalist who attended medical school at the Universities of Freiberg, Munster and Heidelberg in Germany.  He completed a residency in internal medicine at Wayne State University Receiving Hospital followed by a second residency in cardiology at the Cleveland Clinic where he learned the skill of coronary angiography.  He set up a cardiac catheterization laboratory at an affiliate of the University of Freiberg Hospital.  The Chairman of Medicine at Mt. Sinai Hospital in Manhattan had heard of Dr. Rentrop's work and invited him to come to Mt. Sinai which he did in 1980.

Dr. Rentrop had been an innovator in the field of cardiac perforation catheters and infusion catheters and took an interest in excimer laser catheters developed by Spectranetics.  Excimer laser catheters are used to perform angioplasty procedures.  The catheters are used to deliver laser energy to arterial blockages in order to penetrate the blockages so that other therapy or treatment can be administered to the patient.  Spectranetics holds Food and Drug Administration approvals to sell excimer lasers for use in angioplasty and it is the only entity to hold such approvals in the United States.  Dr. Rentrop was trained on the Spectranetics laser catheters and started using them in his practice in early 1995.

Dr. Rentrop began consulting with Spectranetics in March 1998 on the development of extremely small diameter catheters, eventually directing a design for a laser catheter with a tip diameter of .9 millimeters.  Spectranetics had designed and sold excimer

lather catheters with tip diameters in the 1.4 to 2 millimeter range.  The design of the smaller catheter had to account for both the need of the catheter to be flexible enough to get around bends in the circulatory system yet have enough stiffness to permit "pushability."  Dr. Rentrop conveyed his ideas for the small diameter laser catheter to a Spectranetics employee. Dr. Rentrop refined the invention and eventually guided Spectranetics personnel in the design of drawings and the development of a prototype that Dr. Rentrop tested on animals.

Larger laser catheters were useful in debulking blockages in blood vessels, particularly in larger peripheral vessels outside the coronary arteries.  One of the advantages of the small diameter catheters was to focus intense laser energy on a small area of a blockage in order to generate a pilot hole.  The creation of the pilot hole permits the widening of a tiny channel in a blockage with a balloon or stent.

Dr. Rentrop and Spectranetics discussed recognition of Dr. Rentrop's work and, when discussions broke down, Dr. Rentrop filed the application which led to the issuance of the '064 Patent.  Dr. Rentrop filed his first application with the United States Patent and Trademark Office on January 4, 2000, and filed a continuation application on May 15, 2002.  The '064 patent was issued on January 6, 2004.

Claim Construction

Prior to trial, this Court held a hearing at the request of the parties for the sole purpose of construing the word "tip" as it appears in claims 1, 8 and 15 of the '064 Patent and claims 1 and 8 of the '125 Patent.

In an infringement action, the court first must determine the scope and meaning of the patent claims.  See Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1454 (Fed. Cir. 1998).  Claim construction presents a question of law to be decided by the Court.

Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996).

   The Court of Appeals for the Federal Circuit had occasion to restate and clarify the standards for claim construction in Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005) (en banc).  Phillips emphasizes that "[i]t is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  Id. at 1312 (citations omitted).  The "words of a claim 'are generally given their ordinary and customary meaning,'" which "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."  Id. at 1312-13 (citations omitted).  "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  Id. at 1313.  The specification may be the "single best guide to the meaning of a disputed term."  Id. at 1315 (citation omitted).  If it is in evidence, the prosecution history may also have important bearing on the meaning of a claim term, but it may lack the clarity of the specification and, hence, may be less helpful.  Id. at 1317.

   A court may resort to extrinsic evidence, though it is of less significance and less value to the claim construction process.  Id. at 1317.  Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises."  Id. (citations omitted).

   After hearing the parties and reviewing their evidence, I construed the term "tip" as used in the patent claims to mean "that which serves as the end, cap or point of an object."  (See 4/29/2005 Claim Construction Hrg., Tr. 52)

Infringement

      To prevail in a patent infringement suit, the patent owner must prove by a preponderance of the evidence that all elements or limitations of the claims, as construed by the court, are present in the accused device.  Cross Medical Prods., Inc. v. Medtronic Somafor Danek, Inc., 424 F.3d 1293, 1311 (Fed. Cir. 2005).

      The jury concluded that at least one of the accused devices infringed claim 1 of the '064 Patent.[4]  The jury did not find infringement as to claims 2, 3 and 7 of the '064 Patent, and, thus, claim 1 is the only claim at issue on this motion.  Claim 1 of the '064 Patent reads as follows:

    1.  An excimer laser catheter, comprising:

> a catheter shaft containing optical fibers in a concentric arrangement, a tip extending from the catheter shaft and having a diameter that is smaller than that of the catheter shaft, the tip having a length of at least 1 cm and a diameter less than 1 millimeter, each of the optical fibers extending through a full length of the tip and a full length of the catheter shaft, the catheter shaft being configured to be stiffer and less flexible than the tip so as to be pushable to push the tip into a desired site even though the tip negotiates arterial bends to reach the desired site.

(PX 1, col. 4-5.)

      Figure 1 of the '064 Patent, appended hereto, is a drawing representing the tip of the catheter in use in a coronary artery.  As the specifications explain: "A catheter contains optical fibers **12** and has a tip **16** that is inserted through the [coronary] vessel **6** to reach the atherosclerotic blockage **8**. . . . [L]aser radiation energy emerges from the catheter tip **16** to strike atherosclerotic blockage **8** to ablate the same."  (Id., col. 2.)

---

[4]  Claim 1 of the '064 Patent is an independent claim.  Claims 2, 3 and 7 of the '064 Patent are dependent on claim 1.  The accused devices were the 0.9 Extreme Laser Catheter, 0.9 Vitesse Laser Catheters, X-80 Extreme Laser Catheters and X-80 Vitesse Laser Catheters.

Figure 2 of the '064 Patent, also appended hereto, is a drawing of the entire laser catheter system.  It represents the claimed invention together with certain "conventional components" to excimer laser catheters, including "a distal tip **90** preferably made of platinum and an excimer laser **92** (shown in box form)."  (Id., col. 4.)

At trial, both plaintiff and defendant offered experts on the subject of infringement.  Plaintiff's expert, Edward Sinofsky, has a B.S. in physics from S.U.N.Y. Binghamton and a M.S. and Ph.D. in optical science from the University of Arizona.  He holds approximately 50 U.S. patents, a majority in the area of laser catheters or related systems.

In his trial testimony, Dr. Sinofsky walked through the elements of each of the claims, including claim 1, utilizing a claim chart.  In the presence of the jury, he demonstrated how the accused catheters (or product catalogue illustrations of the accused devices) met each element or limitation of the claims.

Dr. Sinofsky initially explained the limitations in claim 1 by reference to Figure 2.  Dr. Sinofsky testified as follows:

> . . . [The item numbered 80 in Figure 2] is something called a bifurcate.  That is a place w[h]ere you have fibers coming in from one side of the catheter . . . .  Then you see in front of the bifurcate, a shaft of the catheter.  The shaft extends to where the change in diameter drops.  This is called the tip of the catheter.  From there, forward, on the end of the tip, is a distal tip.  That is made up of a platinum band to visualize where the tip is under x-rays. . . .
>
> THE COURT:  What does the word "distal" mean?
>
> THE WITNESS:  Means the very end.
>
> Q.  Dr. Sinofsky, in [F]igure 2, you identified a region of the drawing as the "tip."  But that region is not labeled in [F]igure 2.  How do you know that this is the tip?

>A.  In the specifications, the tip is described as extending from the shaft.  So, therefore, there could be no other interpretation but the – the area from the right of the step-down, being the tip of the catheter.
>
>Q.  Does the Section labeled 90 that you identified as the distal tip fit that description?
>
>A.  No, it doesn't, because it doesn't come out of the shaft of the catheter.  Doesn't extend from the shaft of the catheter.

(Trial Tr. 315-316.)

Dr. Sinofsky went on to explain that Figure 2 comprised all of the limitations disclosed in claim 1.  Dr. Sinofsky then testified that his inspection of the accused products demonstrated that the limitations in claim 1 were present in Spectranetics' catheters.

Defendant called Christopher Reiser, Ph.D., as its expert witness.  He holds a bachelors degree from Lawrence Univeristy and received a Ph.D. in physical chemistry from the Massachusetts Institute of Technology.  He designed and built excimer lasers and has done research in the field.  He worked for Spectranetics for 12 years and left the company about a year and a half before he testified at trial.  While at Spectranetics, he had some involvement in the decision-making process regarding compensation proposals to Dr. Rentrop, and signed a confidentiality agreement with Dr. Rentrop on behalf of Spectranetics.  He holds two patents which have been assigned to Spectranetics.  He holds 5,000 shares of stock in Spectranetics.

Dr. Reiser testified that the accused products did not infringe claim 1.  Dr. Reiser explained:

>My conclusion is that there is a difference between the accused products and the wording of the claim based upon my interpretation the same as the Court's for the structure of the tip. . . .
>. . .

In [F]igure 2 we see tip 90.  Tip 90 corresponds in the accused products to the end, the point of the catheter, as I explained earlier, the accused products have platinum there and a glue plug and glass.  It is hard.  It's solid.  It's hard like a rock.  Based on that I conclude that the tip is hard.  The tip, the end, the point of the accused catheters is hard.  Conversely, the language of [claim 1] contains the words – . . .

It says the catheter shaft being configured to be stiffer and less flexible than the tip which means that the tip is more flexible than the catheter shaft . . . .  The point of the accused products is hard.  It is stiffer than the catheter shaft.  So the accused products do not meet that limitation once I apply the meaning of the tip that the judge has given me.

(Trial Tr. 537-538.)

The quoted passages show that the primary difference in the opinions of the experts is whether the "tip" of the accused products is properly understood to be the platinum band, or the entire length of the catheter beginning with the step-down in diameter.  Dr. Sinofsky testified that the latter was correct, and drew a distinction between the catheter "tip" and the "distal tip," testifying that the distal tip is a component that is attached to the tip.  Dr. Reiser, by contrast, limited his testimony regarding the "tip" of the accused products to the platinum band.  This was significant because claim 1 contains the limitation that the catheter shaft is "configured to be stiffer and less flexible than the tip."  As Dr. Reiser explained, the platinum band – the tip, according to his testimony – is stiffer and less flexible than the remainder of the catheter.  Spectranetics also adds in its brief in support of the Rule 50(b) motion that since the platinum band is only 2 millimeters in length, it also does not meet the limitation that the tip be longer than 1 centimeter.

The jury, by its verdict, did not accept Dr. Reiser's testimony regarding infringement of claim 1.  In its motion for JMOL, Spectranetics takes the position that this was clear error.  Spectranetics contends that Dr. Rentrop's only evidence of infringement was

the testimony of Dr. Sinofsky, and that Dr. Sinofsky's testimony could not be relied upon because on cross-examination, Dr. Sinofsky was asked the following questions and gave the following answers:

> Q. Dr. Sinofsky, when you gave your opinion on infringement did you take into account the Court's Markman ruling?
>
> A. I'm not sure what that is.
>
> Q. All right.  So you don't know what I am talking about?
>
> A. I've heard of the Markman ruling, but I don't know what it is.

(Trial. Tr. 347.)

Defendant argues that "[b]ecause Dr. Sinofsky's testimony regarding infringement was not based upon the Court's construction of 'tip,' which the Court instructed the Jury to apply, no reasonable jury could rely upon Dr. Sinofsky's testimony regarding infringement."  (Def. Mem. at 3.)  Defendant argues that Dr. Sinofsky's testimony was plaintiff's only evidence of infringement and that the testimony of Dr. Reiser stands uncontroverted in the record.

I.      Rule 50(b) Motion

A.      Legal Standard

Rule 50(a) states that "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party," the court may, upon motion by the opposing party, grant judgment as a matter of law in the movant's favor.  A motion under Rule 50(a) "may be made at any time before the case is submitted to the jury."  If the issue on which the Rule 50(a) motion is made is submitted to the jury, "[t]he movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after the entry of

judgment" under Rule 50(b), Fed. R. Civ. P.  On a renewed motion under Rule 50(b), the

court may "(A) allow the judgment to stand, (B) order a new trial, or (C) direct entry of

judgment as a matter of law. . . ."  Rule 50(b)(1), Fed. R. Civ. P.

            The Federal Circuit "defers to the law of the regional circuits on matters of

procedural law that do not implicate issues of patent law."  Duro-Last, Inc. v. Custom Seal,

Inc., 321 F.3d 1098, 1106 (Fed. Cir. 2003).  "Thus for questions relating to Rule 50 motions

generally, [the Federal Circuit] has applied regional circuit caselaw."  Id.  The Second Circuit

has stated that "[a] Rule 50 motion may be granted only when, considering the evidence in

the light most favorable to the non-moving party and drawing all reasonable evidentiary

inferences in that party's favor, there was 'no legally sufficient evidentiary basis for a

reasonable jury to find' in favor of the non-moving party."  Nimely v. City of New York, 414

F.3d 381, 390 (2d Cir. 2005) (quoting Fed. R. Civ. P. 50(a)(1)).  The Supreme Court has

explained that

> although the court should review the record as a whole, it must
> disregard all evidence favorable to the moving party that the jury is
> not required to believe. That is, the court should give credence to
> the evidence favoring the nonmovant as well as that evidence
> supporting the moving party that is uncontradicted and
> unimpeached, at least to the extent that that evidence comes from
> disinterested witnesses.

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000) (internal citation and

quotation marks omitted).  The jury's verdict may be disturbed only if the "jury's findings

could only have been the result of sheer surmise and conjecture," or the evidence in favor of

the movant is so overwhelming that "reasonable and fair minded [jurors] could not arrive at a

verdict against [it]."  Nimely, 414 F.3d at 390 (quoting LeBlanc-Sternberg v. Fletcher, 67

F.3d 412, 429 (2d Cir. 1995)).

B.      Discussion

The only basis for JMOL on infringement raised by Spectranetics is its assertion that the testimony of Dr. Sinofsky could not support a verdict of infringement and that Spectranetics' evidence of noninfringement otherwise stands uncontroverted in the record.  Spectranetics argues that Dr. Sinofsky failed to apply the Court's construction of the term "tip" in his analysis and testimony.

In this case, the Court defined the term "tip" in the disjunctive, such that a "tip" is "that which serves as the end, cap or point of an object," and instructed the jury to apply that definition.  The language in claim 1 describes an excimer laser catheter with a tip – that is, an end, cap or point – that features certain limitations.  Among other limitations, it must (1) extend from the catheter shaft, (2) have "a diameter that is smaller than that of the catheter shaft," (3) have "a length of at least 1 cm," and (4) it must be less stiff and more flexible than the shaft.  Claim 1 is a comprising claim, which means it does not "foreclose[] additional elements that . . . [do] not satisfy the stated claim language."  SanDisk Corp. v. Memorex Prods., Inc., 415 F.3d 1278, 1284 (Fed. Cir. 2005).  Therefore, claim 1 does not foreclose the presence of an additional element, such as a platinum band and epoxy glue, that may be attached to the tip.

Based on the limitations, Dr. Sinofsky testified that the "tip" extended from the catheter shaft where the catheter diameter decreased and the catheter became more flexible.  Dr. Sinofsky testified that such a "tip" was present on each of the accused products, and that this tip was longer than 1 cm.  That testimony was consistent with and not contrary to the Court's claim construction.

The jury was carefully instructed that it must accept the Court's claim

construction:

> It is my job as judge to provide you with the meaning of certain claim language.  You must accept the meanings that I give you and use them when you decide whether any claim of the patent has been infringed and whether any claim is invalid.

> I will now tell you the meaning of the word tip as it appears in the claims.  A tip is that which serves as the end, cap or point of an object.

> You should give the rest of the words in the claims the ordinary and customary meaning that they would have for one skilled in the art of [the] invention at the time the application was filed.

> However, you also must consider the meaning [of] claims by reference to the patent specification and the prosecution history. A patent applicant in describing the invention may use a word or term in a manner that is different from its ordinary usage so long as the inventor defines the term in the specification.

(Trial Tr. 1068-69.)

The Court's exclusive authority to define the "tip" was emphasized to the jury

throughout the trial.  The Court had the following colloquy with plaintiff's counsel during the

cross-examination of Dr. Reiser:

> Q.  And it's your understanding from the Markman ruling in this case, that the tip, one of the definitions of the tip, is incorrect?

> A.  The end cap or point, that is correct.

> THE COURT:  Well, it is not one of the definitions.

> Q.  Part of the definitions.

> THE COURT:  No, I think it is the definition . . . .

> Q.  Okay.  So the definition of the tip is incorrect?

> THE COURT:  Well, no.  There – no.  No, that is not the point I was making.
> The definition that was given in the Markman ruling is the definition of tip.
> And there is no other definition for the purposes of this case.

(Trial Tr. 557.)  Shortly thereafter, plaintiff's counsel asked a question of Dr. Reiser which

referred to "your [(i.e., Dr. Reiser's)] definition" of the tip, whereupon the Court interrupted:

> We don't care about the witness' definition, because that is not legally
> relevant.
> …
> A tip has been defined as, "that which serves as the end cap or point of an
> object."

(Trial Tr. 558.)

Dr. Rentrop's counsel, in his summation to the jury, acknowledged the

primacy of the Court's claim construction ruling over any testimony of Dr. Sinofsky.  "[Dr.

Sinofsky] explained each claim element except for the term 'tip' which has been construed

by the Court."  (Trial Tr. 985.)

Spectranetics does not and cannot credibly argue that Dr. Sinofsky's

testimony was <u>inconsistent</u> with the Court's construction of "tip."  This is significant because

"[t]he risk of confusing the jury is high when experts opine on claim construction before the

jury even when, as here, the district court makes it clear to the jury that the district court's

claim constructions control."  <u>Cytologix Corp. v. Ventana Med. Systems, Inc.</u>, 424 F.3d

1168, 1172 (Fed. Cir. 2005).

The Court's construction of the single word "tip" went no further than it

needed.  The "tip" is, indeed, the end, cap or point of an object but this construction of the

claim language set no restriction on the characteristics of a tip.  It neither required nor

foreclosed the possibility that the "tip" could have the characteristics claimed in claim 1, <u>e.g.</u>

that it extends from the catheter shaft, is more flexible than the catheter shaft, has a diameter

smaller than the catheter shaft and has a length of at least 1 centimeter and a diameter less than 1 millimeter.

The jury was instructed as to the Court's claim construction ruling and that the plaintiff needed to prove that each element or limitation of claim 1 was present in the accused devices. Those instructions are not challenged on this motion. The text of claim 1 and the Court's definition of "tip," as physically compared with the accused products, are sufficient to support the jury's conclusion that the elements relating to the tip – that the tip is more flexible than the shaft and has a length of a least 1 cm and a diameter of less than 1 mm – are present in those devices. The jury also had before it the testimony of the inventor, plaintiff's expert and the cross-examination of defendant's expert. The jury's finding of infringement is well-supported by the record and the motion for JMOL is denied.

II.     Motion to Amend the Verdict

Spectranetics moves to amend the jury award on damages. In its verdict, the jury awarded plaintiff $500,000 based on a reasonable royalty, but also wrote on the face of the verdict form, unprompted by the Court or the parties, an award of "out of pocket legal fees, up to . . . $150,000 for prosecuting this lawsuit." (Trial Tr. 1118.) Defendant seeks to strike the award of legal fees.

The jury was not instructed or otherwise authorized to award legal fees to plaintiff. This omission was deliberate. Attorneys' fees are only available to a prevailing party in a patent case when the case is found by the court to be an "exceptional case." See 35 U.S.C. § 285 ("The court in exceptional cases may award reasonable attorney fees to the prevailing party."). Only "[t]he trial judge has discretion to increase damages for exceptional

cases."  Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co., 425 F.3d 1366,

1372 (Fed. Cir. 2005).  The jury's sua sponte award of legal fees is therefore contrary to law.

           In addition, Federal Rule of Civil Procedure 54(d)(2)(A) states that "[c]laims

for attorneys' fees . . . shall be made by motion unless the substantive law governing the

action provides for the recovery of such fees as an element of damages to be proved at trial."

The Second Circuit has held, in the context of a contractual claim of entitlement to attorneys'

fees, that while liability for attorneys' fees is to be determined by a jury, the subsequent

determination of the amount of reasonable attorneys' fees is for the judge to decide.

McGuire v. Russell Miller, Inc., 1 F.3d 1306, 1316 (2d Cir. 1993).[5]  Therefore, not only was

the award of attorneys' fees inconsistent with 35 U.S.C. § 285, but the award was

procedurally improper under Rule 54(d) and contrary to the Second Circuit's holding in

McGuire.

           Spectranetics initially moved to amend the verdict pursuant to Rule 59 or Rule

60, Fed. R. Civ. P.  Neither rule appears to be the appropriate procedural device to obtain the

relief sought, as Rule 59 requires the existence of a judgment, and Rule 60 is addressed to

relief from judgments or orders due to mistake, inadvertence, fraud or the like.  In its reply

brief, Spectranetics argues that Rule 54(b) or the inherent powers of the Court authorize

amendment of the verdict on damages.  Rule 54(b), as relevant here, is addressed only to

revision of interlocutory orders by the Court, and does not speak to amendment of jury

verdicts that are contrary to law or not supported by the evidence.  Similarly, the only case

cited by Spectranetics for the proposition that the Court possesses plenary power to amend

---

[5] I note that, in accordance with the applicable law, plaintiff states in a brief in opposition to the motion to
preclude pre- or post-judgment interest that Dr. Rentrop will seek attorneys' fees by motion following the
entry of judgment.

the verdict is, like Rule 54(b), also addressed to review or revision of interlocutory orders by the Court. This authority is inapposite.

Plaintiff asserts that the verdict on damages should be treated as an "inconsistent verdict" which can be reconciled by the Court by applying the attorneys' fees award to the reasonable royalty and treating the language in the verdict regarding legal fees as surplusage. The verdict on damages is not an inconsistent verdict. No two answers in the verdict are inconsistent with or can be read to contradict one another. Nor was the verdict ambiguous. The jury was quite clear that it intended to impose an additional award of legal fees against the defendant.

Defendant objected to the award of legal fees immediately after the verdict was announced at its earliest opportunity and before the jury was discharged. The award of legal fees is contrary to both the substantive and procedural law applicable to this case. See 35 U.S.C. § 285; Fed. R. Civ. P. 54(d)(2)(A); see also McGuire, 1 F.3d at 1316. Moreover, the jury heard no evidence regarding legal fees, and so the award of "up to $150,000" could only have been the product of sheer surmise and conjecture, and is not supported by legally sufficient evidence. The very language used by the jury in its verdict, that it would award "up to" $150,000, itself reveals conjecture by the jury as to the amount of fees recoverable by plaintiff.

Under these circumstances the award of legal fees is stricken, irrespective of whether the authority to strike that portion of the award is implicit in 35 U.S.C. § 285, Federal Rule of Civil Procedure 54(d), the Second Circuit's opinion in McGuire, the inherent power of the Court, or any other provision of the Federal Rules. Judgment shall be entered for plaintiff in the amount $500,000, based on the reasonable royalty calculation by the jury.

III.      <u>Motion to Preclude Plaintiff from Seeking Pre- and Post-Judgment Interest</u>

Spectranetics moves to preclude plaintiff from seeking pre- and post-judgment interest.  Plaintiff opposes the motion, but has not yet moved to for pre- or post-judgment interest.  Plaintiff's opposition brief indicates that Dr. Rentrop intends to make a motion on these issues following the entry of judgment in this case.

Defendant's motion is denied without prejudice to its opposing plaintiff's contemplated motion.  I note that with respect to pre-judgment interest, 35 U.S.C. § 284 states that a prevailing plaintiff in a patent suit is entitled to damages that are "in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court."  The Supreme Court has held that "prejudgment interest should be awarded under § 284 absent some justification for withholding such an award."  <u>Gen. Motors Corp. v. Devex Corp.</u>, 461 U.S. 648, 657 (1983).  I further note that post-judgment interest is similarly generally available in patent cases under 28 U.S.C. § 1961.  <u>See</u>, <u>e.g.</u>, <u>Transmatic, Inc. v. Gulton Industries, Inc.</u>, 180 F.3d 1343 (1999).

<u>Conclusion</u>

For the foregoing reasons, defendant's motion for JMOL on infringement (Docket No. 80) is DENIED.  Defendant's motion to amend the verdict to strike the award of legal fees (Docket No. 83) is GRANTED.  Defendant's motion to preclude plaintiff from seeking pre- and post- judgment interest (Docket No. 91) is DENIED without prejudice to renewal framed as an opposition to plaintiff's motion for same.  The Clerk is directed to enter judgment for plaintiff in the amount of $500,000.

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated: New York, New York
      August 22, 2007



**FIGURE 1**



**FIGURE 2**